UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

      v.                                                   CASE NO. 8:10-cr-135-T-30MAP

DAVID L. DIXON
_____/

## REPORT AND RECOMMENDATION

The Defendant moves to suppress evidence obtained from him after a traffic stop and a subsequent search of his residence, as well as statements he made to police following his arrest and the issuance of *Miranda* warnings (doc. 19). Having conducted an evidentiary hearing on the matter, I find no constitutional violations occurred; accordingly, I recommend the motion to suppress be denied.[1]

*A. Facts*

By February 2010, the Manatee County Sheriff's Office knew the Defendant well. By then, and by the Defendant's own account, Manatee County authorities had arrested him twenty-five times, a noteworthy figure to have attained at the age of thirty-one. And in the days before his February 24, 2010, arrest, Manatee County detectives had both the Defendant and his girlfriend, Michelle Duval under periods of surveillance as part of an active investigation.

*1. the traffic stop*

On the morning of February 24, a unit of the Manatee County Sheriff's Office met

---

[1] The district judge referred the motion to me for a report and recommendation per 28 U.S.C. § 636(b)(1)(B). *See* doc. 31.

to plan their surveillance of Michelle Duval. The detectives had a warrant for her arrest, and they hoped to arrest her that day. All were briefed about the Defendant's relationship with Duval and warned that he might be armed if encountered. When a taxi arrived at Duval's residence that morning, Detective McClusky spotted the Defendant (McClusky had arrested the Defendant before). The detective radioed others that the Defendant had left Duval's residence in the taxi.

As part of the general plan developed that morning, Detective Plonczynski would be available to make a traffic stop, if appropriate under the circumstances. Plonczynski drove a marked cruiser and wore clothing clearly identifying himself as a deputy. After following the taxi for a bit on a crowded thoroughfare, the detective determined its driver to be speeding and tailgating; accordingly, Plonczynski pulled the taxi over. At first, the taxi stopped in the median between opposite traffic flow, which presented a dangerous situation for the detective. So Plonczynski ordered the driver to move to a safer location, a nearby parking lot. There Plonczynski informed the cab driver that he had been speeding and following the vehicle ahead too closely, two violations the driver acknowledged. At some point during this encounter, Plonczynski noticed the odor of marijuana emanating from the cab and decided to call for a canine. Within a short period Detective Barnett arrived at the scene with his dog. Barnett had participated in the morning's briefing and knew that the Defendant was a subject of the investigation. Barnett also recalled the warning that the Defendant might be armed.

Plonczynski ordered the Defendant to exit the taxi and to lift his sweatshirt (which the Defendant and the officers described as a "hoodie"). At first, the Defendant only lifted

one side of his apparel. Barnett, who was observing all this, noted the Defendant's failure to lift one side of his "hoodie" and the Defendant's position in relation to Plonczynski. Instead of facing Plonczynski directly, the Defendant stood angled (or "bladed," the term Barnett used at the hearing) so that the Defendant's covered waist remained away from the deputy. Barnett, concerned the Defendant might be hiding a handgun, instructed Plonczynski to have the Defendant lift the other side of his sweatshirt. When the Defendant complied, Plonczynski spotted a pistol tucked in the Defendant's waistband. Plonczynski and Barnett secured the Defendant and arrested him for carrying a concealed firearm.[2]

As the officers placed the Defendant in a marked cruiser, the cab driver removed the Defendant's black bag from the backseat and positioned it on the cab's trunk. Barnett, who had not directed the cab driver to do this, saw a bag of marijuana in plain view. Inside the bag, he discovered other drugs and paraphernalia.

While at the scene, Detective Diaz, who also had been briefed that morning, read the Defendant the *Miranda* warnings from a card. At some point during this encounter, the Defendant asked Diaz why so many units had converged to arrest him. When Diaz told the Defendant to be patient, the Defendant commented, "tell it to my lawyer." Yet, despite this statement, the Defendant continued to ask why this had happened, and he openly worried about his predicament. He remarked: "That's life." When Diaz asked what he meant, the Defendant replied: "I am going to get life for all that (expletive) (presumably referring to

---

[2] The Defendant admitted that he purposely lifted one side of his sweatshirt because he feared that if he lifted both, officers would see his gun and shoot him. The firearm the Defendant possessed, a loaded FNH 5.7x28 caliber pistol, is one of the firearms described in count one (18 U.S.C. § 922(g)(1)) and the firearm described in count two (18 U.S.C. § 924(c)).

what detectives had discovered in the bag)."[3]

### 2. the station house interview

Not long thereafter, Diaz placed the Defendant in an interview room at the station house and activated a video recorder to memorialize the event (Government's ex. 1). The detective, using a consent form, once more recited the *Miranda* warnings to the Defendant, after which the following exchange occurred:

| | |
|---|---|
| Detective Diaz: | Having these rights in mind, do you still wish to talk to me? |
| Defendant: | By my signing this does that mean I have to talk to you? Can I have my lawyer here while we talk? |
| Detective Diaz: | If you are asking for an attorney right now, we have to stop about everything and anything. We just go about what we need to do, and you do what you got to do. |
| Defendant: | I wonder why is that. Why you don't want my lawyer here that could advise me what I could comment on and what I should not in the best interests of my case. |
| Detective Diaz: | I understand that, but we just don't operate that way. That is just the way it is. We are not going to have somebody's lawyer come and have to wait on them and conduct stuff when we are trying to move stuff along. And if you do not want to talk to me right now that's fine. [Pause of a few seconds] Give me your social. |

---

[3] Some brief observations are warranted here. My view is that the Defendant, stunned by the heavy police presence, which by then included as many as four or five unmarked units, likely asked Diaz several times what had caused all this. Therefore, he may have told Diaz, "tell it to my lawyer," more than once. Irrespective, the Defendant never asked for a lawyer and admitted at the suppression hearing that he wanted to talk to Diaz so he could learn more about his predicament. The Defendant's understandable curiosity brings up my remaining observation. The Defendant's comment, "I am going to get life," may have been more of a question than a statement. In any event, the Defendant clearly believed he was in more trouble than he had ever experienced. While he had not, at least at the scene, committed to cooperating, he had not ruled it out either. Anxious about the gravity of his situation, he wanted to weigh his options and hear what Diaz had to say.

| | |
|---|---|
| Defendant: | [States social security number] |
| Defendant: | Now can you tell me more on my case? Can you tell me anything? |
| Detective Diaz: | I can't talk to you because you just said you're asking for a lawyer. |
| Defendant: | No I didn't. I just asked you if I could call my lawyer and have her here. And you said if I have her here you do not want to talk. |
| Detective Diaz: | That is pretty much the way it goes. So, now we need to backtrack. Because we need to make sure that you are not requesting your attorney before I sit here and talk to you. |
| Defendant: | (interrupting) I want you to explain, to let me know something. You want me to do all the cooperating. I need some cooperation on your part. |
| Detective Diaz: | This is a two-way street, and I told you that before. We are starting here, ok. Going back (handing the Defendant the consent form), because you brought up your attorney … |
| Defendant: | I'll sign this (looking at consent form). I'll sign this. |

After inquiring about the potential evidence against him and the scope of the investigation, the Defendant admitted dealing in small amounts of controlled substances. He also consented to the search of his residence and informed the detective that searching agents will find a safe and another weapon inside.

*B. Discussion*

The Defendant asserts a host of Fourth Amendment violations for the traffic stop and the searches of his bag and his person: Detective Plonczynski lacked probable cause to stop the taxi (alternatively, no reasonable officer would have stopped the taxi); the detective lacked sufficient cause to frisk the Defendant (namely, Plonczynski could not have smelled

marijuana as it was in a sealed bag); and the search of the bag and his subsequent admissions were tainted by the illegal stop. As to his station house admissions, the Defendant asserts Fifth Amendment violations: the Defendant invoked his right to a lawyer before being questioned; and his statements and his consent were conditioned on promises of leniency or immunity from prosecution that remain unfulfilled. I find none of these arguments persuasive. And the government has fully satisfied its evidentiary burden for demonstrating that the stop of the Defendant, the search of his residence, and Detective Diaz's questioning of the Defendant passed constitutional muster.[4]

> 1. *the traffic stop*

"The Fourth Amendment protects individuals form unreasonable search and seizure." *Harris,* 526 F.3d at 1337 (citations omitted). A traffic stop, to satisfy constitutional

---

[4] At the outset of the suppression hearing, I indicated the Defendant had the burden of proof. My statement could be construed as misleading. Irrespective, the applicable standard is this: a defendant who asserts his rights were violated under the Fourth Amendment has the burden of alleging, and if challenged, of establishing standing and the unreasonableness of the search; however, if the movant establishes an expectation of privacy (standing) and that the search and seizure took place without a search warrant, then the burden of proof shifts to the government to show the application of an exception to the warrant requirement and that the search was otherwise reasonable. *United States v. Bachner,* 706 F.2d 1121, 1125-26 (11th Cir. 1983); *see also United States v. Harris,* 526 F.3d 1334, 1338 (11th Cir. 2008). My statement at the outset of the hearing, which should have been more precisely framed, addressed the first prerequisite: whether one has an expectation of privacy in the back seat of a cab, which is an arguable proposition. The Eleventh Circuit in *Harris*, a case involving a cab, avoided answering the question. Nonetheless, the *Harris* court noted the Supreme Court had suggested in dicta that the backseat of a cab deserved a quantum of privacy. 526 F.3d at 1338-39. Because the government did not challenge the Defendant's standing, I find it unnecessary to decide the issue and, therefore, presume the Defendant had an expectation of privacy in the taxi's backseat. Hence, *Bachner's* standard shifts the burden to the government to show an exception to the warrant requirement applies and that the search was otherwise reasonable.

concerns, requires either probable cause to believe a traffic violation occurred or reasonable suspicion in accordance with a *Terry* stop (*see Terry v. Ohio,* 392 U.S. 1 (1968)). *Id.* The standard is an objective one. Accordingly, an officer's motive will not invalidate an objectively justifiable stop under the Fourth Amendment. *Id.*

Applying these rules, Detective Plonczynski clearly had probable cause to believe the cab driver had violated traffic laws. The detective paced the cab measuring its speed and his; from this exercise, he concluded the cab driver had exceeded the posted limit. That the driver admitted speeding and tailgating only confirmed Plonczynski's observations. Furthermore, Plonczynski's command to the Defendant that he lift up his sweatshirt was justified under the totality of the circumstances. Although the Defendant contends it is implausible that Plonczynski could have detected the odor of marijuana permeating from a sealed bag, I credit Plonczynski's testimony.[5] And while Plonczynski may not have remembered all that was said at the briefing or heard all the radio traffic about the Defendant before the stop, Detective Barnett did. Barnett's concern that the Defendant may have been armed, particularly after observing the Defendant's "bladed" stance against Plonczynski, justified the minimal intrusion to the Defendant during the encounter. In short, Plonczynski's and Barnett's actions satisfied *Terry's* reasonable suspicion standards and concerns about officer safety.

Lastly, a number of reasons also justified the search of the Defendant's bag. Not only were the items in the bag in plain view (the cab driver removed the bag from the passenger

---

[5] The bag had a hole. Although the Defendant testified the bag had no hole when he entered the cab, I do not credit his account.

compartment and placed it on the taxi's trunk), the cab driver had authority to consent to the search of the cab, and the detectives would have discovered the controlled substances in any event. *See Harris,* 526 F.3d at 1339 (cab driver has common authority over passenger compartment and can consent to search); *United States v. Virden,* 488 F.3d 1317, 1322 (11th Cir. 2007) (applying inevitable discovery doctrine). Besides, the detectives were justified in seizing and searching the bag incident to the Defendant's lawful arrest. *Arizona v. Gant,* __ U.S. __, 129 S.Ct. 1710, 1719 (2009) (reiterating that circumstances unique to the vehicle context justify a search incident to a lawful arrest when it is reasonable to believe that evidence relevant to the crime of arrest might be found inside the vehicle).

### 2. station house confession

The Defendant makes two arguments for suppressing the statements he made at the station house: Detective Diaz violated the rule set out in *Edwards v. Arizona,* 451 U.S. 477 (1981); and the Defendant's statements were conditioned on Diaz's promises of immunity from prosecution for any items discovered in his residence.[6] Neither argument is persuasive.

### a. Edwards v. Arizona

When a suspect expresses his "desire to deal with the police only through counsel, [he] is not subject to further interrogation by the authorities until counsel has been made available to him, unless the [suspect] himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Equivocal statements by a suspect are insufficient to trigger *Edwards* protections. *Davis v.*

---

[6] The Defendant's *Edwards v. Arizona* argument does not appear in his moving papers, but his counsel urged it at the suppression hearing. Therefore, I find it appropriate to address this claim.

8

*United States*, 512 U.S. 452, 459 (1994). "Rather, the suspect must unambiguously request counsel." *Id.*

At no point during questioning did Dixon unambiguously request counsel. Dixon asked: "Can I have my lawyer here while we talk?" That question was open to two equally reasonable interpretations: (1) Dixon was asking about his *Miranda* rights as recited by Officer Diaz, or (2) Dixon was asking for an attorney. As Dixon's statement was ambiguous, Detective Diaz was not required to stop his interrogation. *Davis*, 512 U.S. at 461-62.

Although not legally required, the Supreme Court has stated that when "a suspect makes an ambiguous or equivocal statement it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney." *Davis*, 512 U.S. at 461. Detective Diaz followed that good police practice and further explained Dixon's *Miranda* rights: "If you are asking for an attorney right now, we have to stop about everything and anything." When Detective Diaz further stated: "I can't talk to you because you just said you're asking for a lawyer," Dixon responded: "No I didn't. I just asked you if I could call my lawyer and have her here." Detective Diaz explained he needed to make sure Dixon was not requesting an attorney before he spoke to Dixon. Dixon then agreed to talk to Detective Diaz. As a result of Detective Diaz following good police practice, we know Dixon's unambiguous desire was to talk to Detective Diaz without having an attorney present. Accordingly, the statements Dixon made to Detective Diaz were not obtained in violation of *Edwards v. Arizona*.

b. *voluntariness*

Dixon contends his statements to Detective Diaz were involuntary because his will

9

was overborne by Diaz's promises of leniency or immunity from prosecution, namely: that if he consented to the search of his residence, he would not be charged with any crimes arising from the fruits of the search. A corollary to this argument, at least as I broadly interpret it, is that he somehow should be given the benefit of Diaz's promise. Both these arguments obviously presume a factual point – that Diaz promised the Defendant leniency or immunity from prosecution, a promise Diaz denies ever making.

Determining if a confession is voluntary requires examining "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Dickerson v. United States,* 530 U.S. 428, 434 (2000) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973)). This necessitates evaluating "'the totality of all the surrounding circumstances – both the characteristics of the accused and the details of the interrogation.'" *Id.* (citations omitted); *see also United States v. Bernal-Benitez*, 594 F.3d 1303, 1319 (11th Cir.) (discussing voluntariness analysis), *cert. denied*, 130 S. Ct. 2121 (2010) and 130 S. Ct. 2123 (2010) and 2010 WL 2898113 (Oct. 4, 2010). The focus is the "crucial element of police overreaching." *Colorado v. Connelly,* 479 U.S. 157, 163 (1986) (footnote omitted). "Absent police conduct causally related to the confession, there is simply no basis for concluding that any state actor has deprived a criminal defendant of due process." *Id.* at 164 (footnote omitted); *see also United States v. Jones*, 32 F.3d 1512, 1516-17 (11th Cir. 1994). Conduct reaching this threshold usually involves "subjecting the accused to an exhaustingly long interrogation," applying physical force or threatening it, or "the making of a promise that induces a confession." *United States v. Thompson,* 422 F.3d 1285, 1295-96 (11th Cir. 2005) (quotations and citation omitted). "Isolated instances of police deception, and

10

discussions of realistic penalties for cooperative and non-cooperative defendants, are normally insufficient to preclude free choice." *Jones,* 32 F.3d at 1517 (citation omitted).

Admittedly, at the station house, the Defendant makes a statement to Diaz that seems to reiterate an earlier, purported comment Diaz made to the Defendant at the arrest scene, namely: if the Defendant consented to the search of his residence, Diaz assured him that he would not be charged with any crimes resulting from the search. Diaz, during the recorded interview, did not confirm making such a statement (nor did he deny it when the Defendant made the assertion). Regardless, at the suppression hearing, Diaz denied making such a promise.

Added to Diaz's denial are the Defendant's subsequent comments during the station house interview which are at odds with such a promise. For example, the Defendant told Diaz that he did not want his roommate to be held responsible for what detectives found in the residence and he would accept responsibility for the weapon in his safe and any other evidence of crimes found at the site. This acceptance of criminal liability, Diaz's discussions about the fates of cooperating and non-cooperating defendants, and the Defendant's questions about his future are inconsistent with any earlier promise of immunity. Diaz twice provided the *Miranda* warnings to the Defendant, first at the scene of the arrest and then at the station house. Detective Diaz's statements to Dixon regarding cooperation were not misleading and did not unduly overbear Dixon's will. Nor does Detective Diaz's alleged misstatement regarding the pendency of federal charges against Dixon render Dixon's statements involuntary. *See Jones*, 32 F.3d at 1517. Having considered the evidence and the totality of the circumstances, including all reasonable inferences therefrom, I credit Diaz's

account and do not find that he made some promise of immunity associated with the search of the Defendant's residence. In sum, the Defendant's statements at the station house were voluntary and not the product of any coercion.[7]

*C. Conclusion*

For the reasons stated, I recommend the Defendant's motion to suppress (doc. 19) be denied.[8]

IT IS SO REPORTED at Tampa, Florida on November 18, 2010.

MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE

**NOTICE TO PARTIES**

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal. 28 U.S.C. § 636(b)(1).

cc:   The Honorable James S. Moody, Jr.
      Counsel of Record

---

[7] Dixon argues his consent to search his home was invalid as fruit of the poisonous tree under *Wong Sun v. United States*, 371 U.S. 471 (1963), and because of false promises of leniency or immunity from prosecution. For the reasons already stated, these claims fail and the Defendant knowingly and voluntarily consented to the search of his residence.

[8] I note the government alternatively argues the motion to suppress should be denied on grounds that the Defendant filed it untimely. I take no position on that argument and instead address the motion on the merits.